UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Jennifer Lizzol,
Michael Lizzol, and T.G.,
     Plaintiffs

        v.                              Case No. 15-cv-100-SM
                                        Opinion No. 2016 DNH 199
Brothers Property Management
Corporation, Out Back Kayak, Inc.,
and Martin Welch,
     Defendants


                         **O R D E R**


        Jennifer Lizzol, her husband Michael, and their son, T.G.,

filed suit to recover damages for injuries sustained as a result

of a snow machine accident that occurred during a winter

vacation at the Mountain View Grand Resort & Spa, in Whitefield,

New Hampshire ("Mountain View Grand").  Defendants move for

summary judgment based upon a liability release and covenant not

to sue executed by Jennifer and Michael before the accident.

Defendants also move for summary judgment on Michael Lizzol's

and T.G's bystander liability claim.  For the reasons discussed,

defendants' motion is granted.


                    **Standard of Review**

        When ruling on a motion for summary judgment, the court

must "constru[e] the record in the light most favorable to the

1

nonmoving party and resolv[e] all reasonable inferences in that party's favor." Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted). See also Nolan v. CN8, 656 F.3d 71, 76 (1st Cir. 2011). Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).

## Background

Construing the record in the light most favorable to plaintiffs, and resolving all reasonable inferences in their favor, the controlling facts appear to be as follows.

The Lizzols travelled to the Mountain View Grand from Long Island, New York, on January 27, 2013, arriving in the

afternoon.  Prior to their arrival, Jennifer had scheduled a snowmobile lesson and tour for herself, her husband, and her son, as well as for a few of their friends, through the Mountain View Grand's website.  Defs.' Mot. for Summary Judgment, Exh. C at p. 2.  The lessons and guided tour were provided by Out Back Kayak, Inc. ("OBK").  Upon arrival at the resort, the Lizzols quickly put their luggage in their rooms, and then left to participate in the snowmobile activity, including a lesson and tour.  Id.

The Lizzols were directed by the hotel activities desk to a small building on the grounds, where they met a Mountain View Grand employee, who told them to quickly pick out helmets and sign a two-page document that bore the following heading:

**Snow Machine Tour**

**ACKNOWLEDGEMENT OF RISKS AND HAZARDS**
**COVENANT NOT TO SUE**
**WAIVER AND RELEASE OF LIABILITY**

(the "Release").  The Lizzols felt rushed during the process, see, e.g., Defs.' Mot. for Summary Judgment, Exh. C. at p. 3, but both Jennifer and Michael had an opportunity to review the Release, and each signed and initialed it.  (Jennifer executed the release on behalf of her minor son, T.G.).  The Release includes the following language:

> I . . . hereby voluntarily agree to release, waive,
> discharge, hold harmless, defend and indemnify BPMC,
> the field operator, the event promoter, the owners of
> premises used to conduct the snowmobile activity,
> their owners, agents, officers and employees from any
> and all claims, actions or losses for bodily injury,
> property damage, wrongful death or injury, loss of
> services or otherwise which may arise out of my use of
> eques[trian] or other equipment or my participation in
> any BPMC activity.  I specifically understand that I
> am giving up any rights that I may have by releasing,
> discharging and waiving any claims or actions
> presently or in the future for the negligent acts or
> other conduct by the owners, agents, officers,
> designees or employees of BPMC.

Defs.' Mot. for Summary Judgment, Exh. A, p. 1.  The Release

includes five lettered paragraphs that provide tour participants

with a designated space in which to place his or her initials,

thereby confirming that he or she understands and acknowledges

the following:

> (A)  that he or she is physically fit to participate
> in the activity;
>
> (B)  that participation in the activity may result in
> "bodily injury, disease, strains, fractures, partial
> and/or total paralysis, eye injury, dental injury,
> blindness, . . . cold weather injuries, heart attack,
> asthma, vehicle injuries, mental duress, death or
> other ailments that could cause serious disability;"
>
> (C)  that "[t]hese risks and dangers [of bodily
> injury] may be caused by the negligence of the owners,
> employees, officers or agents of the Mountain View
> Grand and/or the negligence of the participants
> . . . ;"
>
> (D)  that by participating "in these activities and/or
> use of equipment, [the participant] . . . assume[s]
> all risks and dangers and all responsibility for any
> loss and/or damages, whether caused in whole or in

part by the negligence or other conduct of the owners,
agents, officers, designees, employees of BPMC, or by
any other person[;]" and

(E)  that the participant "understand[s] that [he or
she is] undertaking this snowmobiling activity at [his
or her] own risk, freely and voluntarily without any
inducement[.]"

Id.  Jennifer did not initial Paragraph B or Paragraph D, and
Michael did not initial Paragraph B.

After signing the Release and obtaining their helmets, the
Lizzols met their tour instructor, OBK employee Martin Welch,
and his assistant, Jennifer Welch.  The Lizzols had no snow
machine experience.  Welch provided a very brief introduction to
and instruction regarding operation of the snow machines.  He
explained how to accelerate, brake, and turn.  He told them that
the tour would never travel faster than 20 miles per hour.
Welch then assisted the tour members with their snowmobile
selections, and the tour began.

Jennifer and Michael rode on a two-person snow machine,
with Jennifer operating the vehicle.  They were directly behind
Welch in the line of snowmobiles.  Their son, T.G., rode by
himself and was farther back in the line.  Welch drove rather
quickly during the tour, and far exceeded the self-imposed 20
miles per hour speed limitation he had announced earlier.
Jennifer did not keep pace, and, as Welch increased his speed

during the second half of the tour, Jennifer lost sight of him.
Jennifer attempted to follow Welch's tracks in the snow, but, in
doing so, lost control of the snowmobile, which left the path
and flipped over.  Jennifer, Michael, and the snow machine fell
down a steep embankment that was approximately seventy-five feet
high.

Both Jennifer and Michael suffered physical injuries, but
Jennifer's were particularly severe.  She lost consciousness,
had collapsed lungs, 10 broken ribs, and multiple injuries to
her spine and back.

The plaintiffs later learned that other customers may have
complained that Welch drove too quickly during earlier snow
machine tours.  After the accident, Mountain View Grand manager,
Chris Diego, asked Michael if Welch had been "going too fast
again."  Pls.' Opp. to Summary Judgment, Exh. 4, p. 6.

Jennifer, Michael, and their son brought suit against
Brothers Property Management Corporation (which owns and
operates the Mountain View Grand), OBK, and Martin Welch,
asserting claims for negligence, including negligent training
and supervision, vicarious liability, bystander liability, and
loss of consortium.  The defendants move for summary judgment,

arguing that the contractual Release is both valid and enforceable.

## Discussion

Defendants argue that the scope of the Release plainly encompasses the claims at issue here because the complaint alleges that, as a result of the defendants' <u>negligence</u>, they were injured while participating in the snow machine lesson and tour activity.  Plaintiffs disagree.

New Hampshire law generally prohibits exculpatory contracts.  McGrath v. SNH Development, Inc., 158 N.H. 540, 542 (2009).  But, there are exceptions.  Exculpatory contracts are enforceable if: "(1) they do not violate public policy; (2) the plaintiff understood the import of the agreement or a reasonable person in [plaintiff's] position would have understood the import of the agreement; and (3) the plaintiff's claims fall within the contemplation of the parties when they executed the contract."  Id. at 542 (quoting Dean v. MacDonald, 147 N.H. 263, 266-67 (2008)).

### A. The Scope of the Release

Plaintiffs argue that the Release is not enforceable because they did not understand it to encompass claims for negligent instruction, or negligent guidance on the snow machine

tour, and a reasonable person in their position would not understand the Release to bar such claims.  They say that the content, structure, and organization of the Release – which plaintiffs contend is verbose, employs obfuscating language, and uses confusing sentence structure – disguised any intent to relieve the defendants of liability for their own negligence related to instruction or guidance along the trail.  They point out that the words "instruction," "lesson" and "guide" are terms that do not appear in the Release.  Rather, the Release focuses on terms like "services," "use of equipment," and "participation in activities."  Altogether, they say, the impression is given that the Release applies only to injuries inherent to snow machine activity and the use of snow machine equipment, but not to harm resulting from an instructor's or guide's failure to act with reasonable care.

The parties' differing subjective understandings of the Release's intent is of limited relevance to the controlling analysis, however, since courts must "judge the intent of the parties by objective criteria rather than the unmanifested states of mind of the parties." Dean, 147 N.H. at 267 (citing Lake v. Sullivan, 145 N.H. 713, 715 (2001) and Barnes v. New Hampshire Karting Ass'n, Inc., 128 N.H. 102, 107 (1986)).  Under applicable New Hampshire law, courts examine the language of a

release and "give the language used by the parties its common

meaning and give the contract itself the meaning that would be

attached to it by a reasonable person." McGrath, 158 N.H. at

545 (internal quotations omitted) (quoting Dean, 147 N.H. at

267). "As long as the language of the release clearly and

specifically indicates the intent to release the defendant from

liability for personal injury caused by the defendant's

negligence, the agreement will be upheld." Id. (internal

quotations omitted) (quoting Dean, 147 N.H. at 267). However, a

defendant "will not be released from liability when the language

of the contract raises any doubt as to whether the plaintiff has

agreed to assume the risk of a defendant's negligence." Allen

v. Dover Co-Recreational Softball League, 148 N.H. 407, 414

(2002) (citations omitted).

    The language used in the Release at issue here is broad in

reach, detailed, and clear.  A reasonable person would be hard

pressed to avoid recognizing the significance and effect of the

words used.  The Release plainly purports to release Mountain

View Grand employees and agents of all liability for their own

negligence, or the negligence of others (e.g. other snowmobile

activity participants), related to the snow machine instruction

and tour (equipment and services).  The Release repeatedly

references waiving the negligence of MVG's employees, officers

and agents. For example, after warning the signatory of the serious risks of injury associated with participation in the snow machine tour, including bodily injury and death, the Release explains that those risks could be caused by "the negligence of the owners, employees or agents of the Mountain View Grand." Defs.' Mot. for Summary Judgment, Exh. A. The Release then states that the signatory agrees to "assume all risks and dangers and all responsibility for any loss and/or damages whether caused in whole or in part by the negligence . . . of the owners, agents, officers, designees, employees of BPMC." Id. The Release further provides: "I specifically understand that I am giving up any rights that I may have by releasing, discharging and waiving any claims or actions . . . for the negligent acts or other conduct by the owners, agents, officers, designees or employees of BPMC." Id.

The language of the Release unarguably applies to claims or suits based on the negligence of Mountain View Grand owners, employees, officers or agents. The Release does not qualify or limit the "negligence" being released in any way, nor is the Release ambiguous in that regard. References in the Release to "participation in [the] activity" also make clear that claims arising from the releasees' negligence associated with the described activity are being waived.

10

The Lizzols participated in an activity that consisted
of a snow machine lesson and a snow machine tour.
Plaintiffs' claim that they were injured because defendants
negligently conducted both the snow machine lesson and the
tour.  Their negligence claims, then, necessarily arise
directly from their participation in the activity (the snow
machine lesson and tour).  That the Release does not
include terms like "instruction," "lesson" or "guide" is
not dispositive: "[T]he parties need not have contemplated
the precise occurrence that resulted in the plaintiff's
injuries, and may adopt language that covers a broad range
of accidents."  McGrath, 158 N.H. at 545 (internal
citations omitted) (citing Barnes, 128 N.H. at 107).  So,
attempting to carve out discrete acts of negligence from
the Release is futile if, as here, those discrete acts are
associated with the conduct of the snow machine instruction
and tour activity.

A reasonable person "would have contemplated that the
agreements released the defendants from any negligence, not just
from negligence inherent" in snowmobiling.  McGrath, 158 N.H. at
547.

**B. The Release encompasses the negligence claims against OBK**

Plaintiffs further argue that the Release failed to place them on notice that they were releasing OBK from liability, since OBK is not a named party to the exculpatory contract, and is not mentioned by name.  Relying on <u>Porter v. Dartmouth College</u>, No. 07-cv-28-PB, 2009 WL 3227831 (D.N.H. Sept. 30, 2009), plaintiffs note that the Release repeatedly makes reference to the Mountain View Grand and its equipment, but does not mention OBK or its instructors.  Therefore, they say, a reasonable person would not understand that the Release also purported to absolve OBK from liability for its own negligence.

"An exculpatory contract need not specifically identify the defendant by name."  <u>Porter</u>, 2009 WL 3227831, at *3 (citing <u>Dean</u>, 147 N.H. at 270).  "However, the contract must at least provide a functional identification of the parties being released."  <u>Id</u>.  Here, the Release reads in relevant part:

> I . . . voluntarily agree to release . . . BPMC, <u>the field operator</u>, the event promoter, <u>the owners of premises used to conduct the snowmobile activity</u>, <u>their owners</u>, <u>agents</u>, <u>officers</u> and <u>employees</u> from any and all claims, actions or losses for bodily injury, . . . wrongful death or injury, loss of services or otherwise which may arise out of my use of [equestrian] or other equipment or my participation in any BPMC activity.  I specifically understand that I am giving up any rights that I may have by <u>releasing</u>, <u>discharging</u> and <u>waiving</u> <u>any claims or actions</u> . . . for the <u>negligent acts or</u>

<u>other</u> <u>conduct</u> <u>by</u> <u>the</u> <u>owners</u>, <u>agents</u>, <u>officers</u>,
designees or <u>employees</u> of BPMC.

Defs.' Mot. for Summary Judgment, Exh. A (emphasis supplied).


Defendants point out that OBK, and Welch individually, are covered by the Release because they are both "agents" of BPMC, and they acted as the referenced "field operator" for the snow machine tour. Indeed, plaintiffs specifically alleged the existence of an agency relationship between BPMC and OBK in their Complaint. <u>See</u>, <u>e.g.,</u> Compl. ¶ 48 ("Mountain View Grand controlled in whole or in part the activities engaged in by Out Back Kayak and/or its employees and is vicariously liable for the negligent actions of the snow mobile tour guides committed while engaged in the scope of employment."). The asserted agency relationship is an essential element of plaintiffs' vicarious liability claim. Defendants readily agree that OBK and Welch were agents of BPMC. For reasons satisfactory to the parties, they do not dispute OBK's or Welch's status as agents of BPMC. As BPMC's agent, OBK and Welch are plainly covered by the Release.

Moreover, plaintiffs' reliance on <u>Porter</u> is unhelpful. In <u>Porter</u>, the plaintiff, an undergraduate student at Dartmouth College, was fatally injured while participating in a class that

13

included ski lessons, at a facility owned, operated, and maintained by Dartmouth.  2009 WL 3227831, at *1.  Her estate filed suit, asserting claims for negligence and wrongful death. Id.  Dartmouth argued that the claims were barred by a release agreement plaintiff signed before renting ski equipment for the class.  Id. at 2.  The release in Porter, which had been drafted by Solomon (the ski and bindings manufacturer), did not mention Dartmouth by name, and repeatedly emphasized and referred only to ski equipment being rented by the student.  See id. at 3. Based on those distinguishing facts, the court concluded that the release failed to place the "equipment renter on even functional notice that Dartmouth was in any way a party" to the release agreement.  Id.

Unlike the release at issue in Porter, the Release here makes evident that it pertains not just to the furnishing and use of equipment associated with the snow machine activity, but also to the furnishing of services associated with that activity.  The clearest example is found in the first paragraph of the Release, which provides: "In consideration of Brothers Property Management Corporation . . . furnishing services and equipment to enable me to participate in the Snow Machine tour (snowmobiling), I acknowledge and agree as follows."  Defs.' Mot. for Summary Judgment, Exh. A (emphasis added).  Indeed,

nearly every time the Release references the signatory's use of
equipment, the Release also references the signatory's
participation in the snow machine lesson and tour.  See id. Such
references objectively manifest the parties' intent that the
Release encompass all claims based upon the negligent provision
of services – including services provided by Mountain View
Grand's agent, OBK — that related to plaintiffs' participation
in the snow machine tour activity.  While not identified by
name, OBK and Welch were functionally identified as benefitting
from the Release, when acting as agents of Mountain View Grand.

### C. Jennifer's failure to initial certain paragraphs of the Release does not preclude its enforcement.

Plaintiffs next argue that, even if the Release does
encompass the claims at issue, it is still not enforceable
against Jennifer, because she failed to initial paragraphs B and
D of the Release.  Plaintiffs characterize the lettered
paragraphs as "several distinct exculpatory clauses" that they
were required to agree to separately, and which, as structured,
give the impression that "the participant might agree to certain
terms, but not others."  Pls.' Mem. in Opp. to Mot. for Summary
Judgment at p. 18.  Because Jennifer did not initial two of the
contract's paragraphs, plaintiffs say, those paragraphs are not
enforceable against her.  At the very least, plaintiffs
continue, Jennifer's failure to initial those paragraphs gives

rise to disputed issues of material fact regarding her intent to
be bound by those paragraphs, and whether there was a "meeting
of the minds" with respect to releasing defendants from
liability for their own negligence.  Id.

In response, defendants point out that the final paragraph
of the Release reads:

> I have read the above paragraphs and fully understand
> their content.  I understand that this is a Release of
> Liability, which will legally prevent me or any other
> person from filing suit and making any other claims for
> damages in the event of personal injury, death or
> property damage.

Defs.' Mot. for Summary Judgment, Exh. A.  Defendants argue that
the final paragraph clearly and explicitly incorporates the
terms of paragraphs B and D, and therefore plaintiffs' argument
is unavailing.

The final paragraph of the Release is unambiguous.  By
signing the Release, Jennifer acknowledged that she had read the
entire agreement and agreed to its terms; all of its terms.  Cf.
Serna v. Lafayette Nordic Vill., Inc., No. 14-CV-049-JD, 2015
WL 4366250, at *3 (D.N.H. July 16, 2015) (finding that
plaintiff's failure to sign a release on the back of a form did
not bar enforcement, where plaintiff had signed the front of the
agreement following a statement acknowledging that she had read

the agreement on the back of the form concerning the release of liability, and agreed to its terms); see also Gannett v. Merchants Mut. Ins. Co., 131 N.H. 266, 269–70 (1988) ("The plaintiff argues, however, that she is not bound by the condition in the release, as she never returned the release to Merchants. The return of the release, however, is irrelevant, as it was the acceptance of a check offered on the condition that it constitute payment in full, rather than the signing of the release, which bound [plaintiff]. It is also irrelevant whether she actually read the release, when the release clearly and unambiguously stated the condition, and when [plaintiff] had the opportunity to read it before cashing the check.").  Here, Jennifer acknowledged having read the entire release and objectively manifested her agreement, after which she accepted the services to be provided only on condition that a full release first be given.

The parties do not cite New Hampshire authorities directly on point, nor has the court found any, but it appears that the Tenth Circuit addressed a nearly identical issue in Elsken v. Network Multi-Family Security Corp, 49 F.3d 1470 (10th Cir. 1995).  In Elsken, the plaintiff entered into a services agreement with a security corporation to provide a 24-hour alarm system.  Id. at 1471.  The agreement contained a limitation of

liability clause, on the same page as a space provided for a
party to initial. Id. at 1473. The plaintiff signed the
agreement, but failed to initial the line next to the limitation
of liability clause. Plaintiff there also signed the agreement
below a provision "articulating a presumption that the agreement
was properly executed," which read:

> Resident acknowledges that resident has read and
> understands all of this resident agreement including
> the terms and conditions on this side and the reverse
> side, particularly Paragraph 3.0 Limitation of
> Liability and agrees to the amounts set forth herein.

Id. at 1473. The plaintiff was subsequently fatally stabbed in
her apartment. Her estate filed suit against the security alarm
company, asserting claims for breach of contract, negligence,
and breach of warranties based on the alarm company's failure to
properly respond to an alarm. Plaintiffs argued that the
limitation of liability clause was not effective because
plaintiff did not initial the line provided for that purpose,
and, therefore, had not objectively manifested her agreement to
the waiver provision. Id. at 1472-73.

The court of appeals found that plaintiff's failure to
initial the line provided did not preclude summary judgment,
since plaintiff had signed "directly below a statement of
acceptance of the contract that explicitly incorporates the
provisions on the reverse side of the page." Id. at 1474. The

court determined that, "[b]ased upon a plain reading of the contract," plaintiff agreed to the contract in its entirety as written.  Id.  So too, here.  Jennifer's signature directly follows a paragraph that references the liability waiver clauses defendants seek to enforce.

Finally, plaintiffs point to no evidence in the record that might support a finding that Jennifer's failure to initial paragraphs B and D was in any way motivated by an objection to or non-acceptance of either of those terms.  Nor do they point to evidence in the record that would support a finding that Jennifer ever expressed any objection to the terms of paragraphs B and D before executing the agreement.  Indeed, the relevant evidence of record suggests that Jennifer's failure to initial paragraphs B and D was not the product of a conscious decision. See Defs.' Mot. for Summary Judgment, Exh. C, p. 4 (Q: "Do you have any explanation for why A, C, and E were initialed, but not B and D?" Jennifer Lizzol: "No." . . . Q: "Was there a conscious decision on your part not to initial B and D?" Jennifer Lizzol: "No.")

Jennifer Lizzol's failure to initial paragraphs B and D of the Release does not render the Release or those paragraphs unenforceable against her.  The same general analysis applies to Michael Lizzol's failure to initial Paragraph B of the Release.

19

**D. The Release does not violate public policy.**

Plaintiffs argue that the Release contravenes public policy, because its enforcement would relieve an instructor from liability for his own negligent instruction.  Plaintiffs contend that because the instructor/guide holds a position of authority over the conduct of the snow machine tour, the instructor/guide is uniquely positioned to ensure that the tour is conducted in a reasonably safe manner.  So, plaintiffs say, releasing an instructor of his or her obligation to exercise reasonable care will result in that instructor failing to make a good faith effort to carry out his duties, which, they say, is what happened here.  That contravenes public policy, they argue, because it will surely impede public safety.

The argument, while creative, avoids the public policy analysis required under New Hampshire law.  "A defendant seeking to avoid liability must show that the exculpatory agreement does not contravene public policy; i.e., that no special relationship existed between the parties and that there was no other disparity in bargaining power."  Barnes, 128 N.H. at 106.  "'A special relationship exists when "the defendant is a common carrier, innkeeper or public utility, or is otherwise charged with a duty of public service.'"  Serna v. Lafayette Nordic Vill., Inc., 2015 WL 4366250, at *2 (quoting Barnes, 128 N.H. at

106).  Additionally, a release may be against public policy if, among other things, "it is injurious to the interests of the public, violates some public statute, or tends to interfere with the public welfare or safety."  Serna, 2015 WL 4366250, at *2 (citing McGrath, 158 N.H. at 543).

Plaintiffs do not contend that a "special relationship" existed between the parties, as that term is used in the liability waiver context.  Nor could they.  While the Mountain View Grand is an inn, the Release does "not pertain to the usual activities of running an inn," but instead to the Mountain View Grand's facilitation of collateral outdoor recreation activities.  Serna v. Lafayette Nordic Vill., Inc., 2015 WL 4366250, at *2.  And snowmobiling (like skating, Serna, id., and snowboarding, McGrath, 158 N.H. at 544) constitutes recreational activity, not "an activity 'of such great importance or necessity to the public that it creates a special relationship.'"  Serna, 2015 WL 4366250, at *2 (quoting McGrath, 158 N.H. at 544).

"Where there is a disparity in bargaining power, the plaintiff may not be deemed to have freely chosen to enter into the contract."  McGrath, 158 N.H. at 544 (citing Barnes, 128 N.H. at 107).  But, "there [is] no substantial disparity in bargaining power among the parties, despite the fact that

21

[plaintiffs were] required to sign the release in order to"
participate in the snow machine lesson and tour.  <u>Barnes</u>, 128
N.H. at 108.  Here, the plaintiffs were "under no physical or
economic compulsion to sign the release," and "[s]ince the
defendants' service is not an essential one, the defendants had
no advantage of bargaining strength" over the plaintiffs or
others who sought to participate in the snowmobile lesson and
tour.  <u>Barnes</u>, 128 N.H. at 108.

The Release does not violate public policy.

### E. The plaintiffs have not sufficiently established fraud in the inducement.

Finally, plaintiffs argue that the Release is unenforceable
because they were fraudulently induced to enter into the
agreement.  Plaintiffs assert that defendants had prior
knowledge that Welch generally drove too quickly when conducting
snow machine tours, and, notwithstanding that knowledge, failed
(negligently) to take reasonable steps to ensure that Welch
conducted the tours safely.  Plaintiffs further contend that
they were induced to sign the Release based upon defendants'
false assurances that the lesson and tour would be conducted in
a safe manner, with adequate instruction, and at a safe speed.
Relying on those assurances, plaintiffs signed the Release.
Plaintiffs argue that, at the very least, whether the defendants

made assurances (and omissions) regarding the nature of the snow

machine tour with conscious indifference to the truth, and

whether the plaintiffs justifiably relied upon those statements

when signing the Release, are disputed issues of material fact

precluding summary judgment.

"Under New Hampshire law, fraud in the inducement is a

valid defense to a contract action and can be raised to void a

contract." Bryant v. Liberty Mut. Grp., Inc., No. 11-CV-217-SM,

2013 WL 2403483, at *9 (D.N.H. May 31, 2013) (citing Nashua

Trust Co. v. Weisman, 122 N.H. 397, 400 (1982)).  As the parties

seeking to invalidate the Release on fraudulent inducement

grounds, plaintiffs bear a substantial burden: they "must

establish that the other party made a representation with

knowledge of its falsity or with conscious indifference to its

truth with the intention to cause another to rely upon it.  In

addition, the party seeking to prove fraud must demonstrate

justifiable reliance."  Trefethen v. Liberty Mut. Grp., Inc.,

No. 11-CV-225-SM, 2013 WL 2403314, at *7 (D.N.H. May 31,

2013)(quoting Van Der Stok v. Van Voorhees, 151 N.H. 679, 682

(2005)) (additional citations omitted).

Plaintiffs rely on Van Der Stok v. Van Voorhees, but that

decision offers little support.  That case arose out of a

transaction for the sale of real estate.  The plaintiff

represented that defendant-purchaser would be able to build on
the property, but did not disclose that his own earlier
application to the zoning board for a permit to build on the
property had been denied.  After the closing, defendant went to
the town offices to inquire about the property, and first
learned that plaintiff's earlier permit application had been
denied.  Defendant stopped payment on the check given at closing
to cover the purchase price.  The plaintiff subsequently filed
an action, and defendant raised fraud in the inducement as a
defense to plaintiff's claims.  Plaintiff argued the defendant
could not show reasonable reliance on his purported
misrepresentation, because the purchase and sale agreement
provided, "Seller makes no representations as to land use law or
regulations."  Id. at 682.

        The New Hampshire Supreme Court rejected that argument for
two reasons.  First, the court was unconvinced that the
disclaimer "would put a reasonable person on notice that he
could not rely upon the specific representation made . . . that
the particular lot he was buying was a buildable lot."  Id. at
683.  Moreover, the plaintiff had "made a representation with
knowledge of its falsity or with conscious indifference to the
truth with the intention to cause another to rely upon it."  Id.
(quoting Snierson v. Scruton, 145 N.H. 73, 77 (2000)).  Such

"positive fraud," the court stated, "vitiates every thing." Id.
(quoting Jones v. Emery, 40 N.H. 348, 350 (1860)).

This case is distinguishable from Van Der Stok because the
Lizzols have not shown what representation defendant(s)
allegedly made "with knowledge of its falsity or with conscious
indifference to its truth with the intention to cause another to
rely upon it." Id. In support of their assertion that
defendants knew (or believed) that Walsh was likely to conduct
their particular tour in an unsafe manner, plaintiffs point to
the following: (1) "[u]pon information and belief, there had
been complaints from customers that OBK's tour guides,
specifically Martin Welch, had driven unreasonably fast while
conducting tours; (2) after the incident, the MVG manager asked
Michael if Welch had been "driving too fast again."

Admissibility of that evidence is doubtful, and it is
plainly insufficient to support a finding that defendants knew
that plaintiffs' lesson and tour would be conducted in a
negligent or actionably unsafe manner or were recklessly
indifferent to that likelihood. And plaintiffs have identified
no particular representation made by defendants, with the
intention to induce plaintiffs to rely upon it, and, upon which
they justifiably relied, that either proved to be false or the
product of reckless indifference to the truth. The only

statement in the record to which they point (Welch's statement
that he would not drive the snow machines faster than 20 miles
per hour) occurred after plaintiffs signed the Release.  The
record is also utterly silent with respect to whether speed in
excess of 20 mph is considered dangerous or negligent when
conducting a snowmobile tour, or whether "too fast" in the past
equates to the speed driven by the guide on plaintiffs' tour, or
even what "too fast" might mean in the context of a snowmobile
tour that included novices.

Because plaintiffs have not produced sufficient evidence
from which a finder of fact could conclude that the defendants
knowingly made fraudulent representations to them, they have not
established that a genuine issue of fact exists with respect to
whether their execution of the Release was fraudulently induced,
and is therefore ineffective.

The Release is valid and enforceable, and it encompasses
the plaintiffs' bystander liability claim as well as their
negligence claims.

## Conclusion

For the foregoing reasons, and for those argued in the
defendants' memoranda, the motion for summary judgment (document
no. 23) is necessarily granted under controlling New Hampshire

law. The Release at issue here is not ambiguous. It unmistakably released the defendants from any liability relating to their negligence, and that of their employees and agents. Neither qualifying language nor any other provision in, nor the structure of the Release, obscured the defendants' intent to be relieved of all liability for their own negligence. A reasonable person would have understood that the Release relieved the defendants of all liability for injuries caused by their negligence. The Clerk of Court shall enter judgment for defendants and close the case.

      **SO ORDERED.**

                                 Steven J. McAuliffe
                                 United States District Judge

October 31, 2016

cc: Philip R. Waystack, Jr., Esq.
     Sandra L. Cabrera, Esq.
     Paul B. Kleinman, Esq.